TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
NV Bar #3984
1130 Wakefield Trail
Reno, NV 89523
Tele (775) 337-0323
keysercooper@lawyer.com
*Attorney for Plaintiff Oumar Sidibe*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| OUMAR SIDIBE, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **Jury Demand** |
| MEI-GSR HOLDINGS LLC dba GRAND SIERRA RESORT AND CASINO and MOHAMMAD RAFAQAT, | |
| Defendant. | |

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000a, 42 U.S.C. §1981, and pendant state claims.

2. Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district. This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. Section 2201 and Federal Rules of Civil Procedure ("FRCP"), Rule 57.

## PARTIES

1

3.     Plaintiff OUMAR SIDIBE ("Mr. Sidibe" or "Plaintiff"), 25, is a resident of the City of Reno, Washoe County, Nevada. Mr. Sidibe is an employee at Tesla and a student at University of Nevada Reno.

4.     Defendant MEI-GSR HOLDINGS LLC is a Nevada Limited Liability Company (hereinafter "GSR") doing business as Grand Sierra Resort and Casino, is located at 2500 East Second Street, Reno, NV. It is duly organized under the laws of the State of Nevada.

5.     Defendant MOHAMMAD RAFAQAT (hereinafter "Mr. Rafaqat") is and at all times was the Director of Security for Grand Sierra Resort and Casino.

6.     Plaintiff alleges that Defendants and/or their agents, employees, and servants performed, participated in, aided and/or abetted in some manner, the acts averred herein and proximately caused the damages alleged. Plaintiff further alleges that Defendants ratified, approved, delegated, and authorized all actions of its agents, employees, and servants.

**FACTUAL ALLEGATIONS**

7.     Mr. Sidibe is of black African ethnicity. He is originally from the country of Mali.

8.     Mr. Sidibe is a devout practicing Sunni Muslim. Mr. Sidibe engages in Salat, the obligatory spiritual act of worship that is observed five times every day at prescribed times, at dawn, midday, late afternoon, just after sunset, and between sunset and midnight. This prayer ritual, over 1400 years old, is performed by hundreds of millions of Islamic people all around the world. He faces to Mecca, standing, bowing, and prostrating himself and concludes by sitting on the ground. During each posture, he recites or reads certain verses, phrases, and prayers. Mr. Sidibe works twelve hour shifts for his employer, and quietly, during his breaks, at the required times and in accordance with his employer's schedule, performs the required prayers without incident or problem.

9.     Mr. Sidibe also practices Wudu, the Islamic religious procedure for wiping or cleansing

2

parts of the body, a type of ritual purification, after urination. Typically, when Mr. Sidibe is out of his home, or at work or at the university, he purifies himself after urination with water. He has a small cup of water he uses to wash his private parts when it is necessary for him to use a public restroom for urination. This act of self-cleansing is essential to Mr. Sidibe's religious practices because if even a small drop of urine were to present itself on his underwear after urination, he would be soiled and unable to pray in that clothing until he was able to change his underwear. Since Mr. Sidibe prays five times each day, he must find a way to conduct his prayers in clean clothing, hence washing himself with water is an absolute religious requirement after urination.

10. GSR is a place of public accommodation within the meaning of 42 U.S.C. § 2000(a)(b) as it is a hotel which provides lodging to transient guests, and has on its premises a restaurant, lunchroom and other facilities which engage in the selling of food for consumption—as such it is an establishment which affects interstate commerce and a public accommodation.

11. Approximately one-week before June 14, 2019, Mariah Campbell, the wife of Mr. Sidibe's supervisor at Tesla, telephoned the GSR resort to reserve a cabana in the VIP area. Mrs. Campbell spoke to Grand Sierra Resort & Casino Executive Entertainment Host Tommy Emrich to make the arrangements. Mr. Emrich explained to Mrs. Campbell that the price for reserving the cabana in the VIP area was $350 plus a 22% gratuity. Mr. Emrich further explained that by reserving the cabana for the day, Mrs. Campbell would be obligated to spend a minimum of $350.00 on food and drinks plus the gratuity—if Mrs. Campbell spent more than $350.00 on food and drinks, that too would be added to her bill. After a brief discussion of the terms and conditions of the reservation, Mrs. Campbell agreed to the contractual arrangement as outlined by Mr. Emrich and provided her credit card to hold the reservation for June 14, 2019.

12. As a further condition of the contract, Mr. Emrich made clear Mrs. Campbell would

have the right to invite ten guests to enjoy the premises with her. The purchase of the cabana for June 14, 2019, came with the right to have a minimum of ten guests. Mr. Emrich stated that in addition to the exclusive features of the VIP section, which included a private cabana and use of the VIP pool, Mrs. Campbell's guests would also have the ability to order food and drinks, the costs of which would be added to Mrs. Campbell's bill as the day progressed.

13. Mariah Campbell and her husband Terrell Campbell arrived at the GSR on June 14, 2019 to check in for their day of fun and pleasure at the GSR. Both had anticipated a day of luxury and comfort as the pampered guests of the GSR in its VIP section. The Campbells had invited several guests to enjoy the day with them, including Mr. Sidibe, explaining it would be a fun day with deluxe treatment in beautiful surroundings.

14. Mariah and Terrell Campbell are African-American. Their invited guests were also African-American.

15. Oumar Sidibe was the first of the Campbells' invited guests to arrive, following shortly after Mr. and Mrs. Campbell. Mr. Campbell is Mr. Sidibe's supervisor at Tesla. Mr. Campbell also invited some of his other Tesla employees.

16. It is believed and alleged that on June 14, 2019 all other guests of the VIP section of the GSR were Caucasian.

17. The contract between Mrs. Campbell and GSR made Mrs. Campbell the business invitee of the GSR. A business invitee is someone who enters or remains on a person's property for a business purpose. In contracting with Mrs. Campbell, the GSR was required to take reasonable care to avoid discrimination on the basis of race or religion and to follow all state and federal laws that prohibit discrimination and require the equal enjoyment of places of public accommodation to all persons without regard to race, color, or religion.

18. Mr. Sidibe, as the invited guest of the Campbells, was a third-party beneficiary of the contract between Mrs. Campbell and the GSR. A third party beneficiary is a person who will benefit from a contract made between two other parties. As a third-party beneficiary of the contract between Mrs. Campbell and the GSR, Mr. Sidibe had the legal right to expect the same treatment, conduct, behavior and care as provided to Mrs. Campbell and her other guests. Mrs. Campbell understood in contracting for the luxurious day at the VIP section of the GSR that their guests were entitled to the full and equal enjoyment of the goods, services, facilities, privileges, and accommodations of GSR without discrimination on the grounds of race, color or religion. Mr. Faraqat was aware that Mr. Sidibe was the invited guest of Mrs. Campbell.

19. Mr. Sidibe went directly to the cabana reserved by Mrs. Campbell. He was encouraged by both Mr. and Mrs. Campbell to enjoy the snacks on the tables, to relax in the cabana, to use the pool, and to have something to drink.

20. Mr. Sidibe went into the pool. At the time he used the pool, he was the only person of African ethnicity in the pool. After spending some time in the pool, Mr. Sidibe exited the pool to use the restroom by the pool.[1]

21. Mr. Sidibe went inside a toilet stall to change from his swimsuit into his street clothes. Mr. Sidibe used the restroom's urinal. According to his Muslim religion and practice, immediately after urinating, Mr. Sidibe followed the Islamic tradition of Wudu which included washing his private parts. It is forbidden to have even a drop of urine splash on his underwear. Should any urine fall on his underwear, he is prohibited from praying in that underwear as his clothing is "soiled." To ensure his clothing remains clean, Mr. Sidibe takes a small cup with him into any bathroom he uses, fills it with tap water, takes the water to the urinal. After urinating, Mr. Sidibe pours the water over his genitals. This is

---

[1] Mr. Sidibe believes he may have used the restroom twice during his brief stay at the GSR.

what he did at the GSR when he used the restroom: Mr. Sidibe filled a small cup with tap water, went to the urinal, urinated, and poured the small cup of water over his private parts.

22. After this ritual wash, Mr. Sidibe exited the restroom, and returned to his friends at the VIP section.[2] Upon returning to the cabana, Mr. Sidibe noticed Mrs. Campbell engaged in a conversation with Defendant Rafaqat. It is alleged that Mr. Rafaqat, as GSR Director of Security, was a member of the GSR supervisory staff.[3] Mr. Sidibe watched Mrs. Campbell talking to Mr. Rafaqat and could tell Mrs. Campbell was upset about something. Mr. Sidibe also noticed Mr. Campbell talking with Mr. Rafaqat.

23. Mr. Rafaqat approached Mr. Sidibe asking if he was "Oumar." Mr. Sidibe immediately identified himself as Oumar Sidibe. Mr. Rafaqat informed Mr. Sidibe that he had received two complaints about Mr. Sidibe. Mr. Rafaqat stated that the first complaint was that Mr. Sidibe was acting "weird" in the pool. Mr. Rafaqat failed to describe what acting "weird" in the pool meant.

24. Mr. Sidibe asked what Mr. Rafaqat meant by stating he was acting "weird" in the pool as he had no idea what Mr. Rafaqat was talking about as Mr. Rafaqat refused to describe what acting "weird" in the pool meant.

25. Mr. Rafaqat stated there was also a second complaint about Mr. Sidibe, that he had been "touching himself" inappropriately in the restroom.

26. Mr. Sidibe had no idea what Mr. Rafaqat was talking about and asked what Rafaqat meant by touching himself inappropriately. Mr. Sidibe asked if there was video or "footage" that would establish what he had been doing. Mr. Rafaqat said there was no video. Mr. Rafaqat indicated he had not personally seen any inappropriate conduct.

---

[2] While there were other people in the restroom, Mr. Sidibe kept to himself in the restroom, maintained his privacy, and said nothing to anyone.

[3] Also present were additional unidentified GSR staff.

6

27. Mr. Sidibe heard Mr. Campbell in a discussion with Mr. Rafaqat. Mr. Campbell, stunned at the accusation against Mr. Sidibe, said, words to the effect, "You have the wrong person, Mr. Sidibe is a devout practicing Muslim. He is not the type of person to do anything inappropriate. There is no way he was behaving improperly." Mr. Campbell asked Mr. Rafaqat if he was accusing Mr. Sidibe of "jerking off" in the restroom. Mr. Rafaqat said that he was. Mr. Campbell insisted there was no way Mr. Sidibe was "jerking off," behaving "weird" or in any way "inappropriate" at the GSR. Mr. Campbell came to Mr. Sidibe's defense, explaining that Mr. Sidibe was an invited guest under the contractual arrangement made with the GSR and he was not engaged in anything inappropriate at the GSR.

28. Mr. Rafaqat said Mr. Sidibe had to immediately leave the GSR. Mr. Rafaqat insisted Mr. Sidibe was guilty of offensive conduct had to immediately leave the resort. Mr. Rafaqat was not the slightest bit interested in hearing what Mr. Sidibe had to say. Mr. Rafaqat had obviously made up his mind to kick Mr. Sidibe out of the GSR, even before talking to him.

29. Mr. Sidibe was shocked, confused, horrified, and embarrassed. He said words to the effect: "This is crazy. I didn't do anything." He was very upset, almost to the point of tears. He denied that he had been behaving "weird" in the pool or touching himself inappropriately in the restroom. His head swam in turmoil, as he is a very private and modest person.

30. Mr. Rafaqat remained firm, Mr. Sidibe had to leave, immediately, he was being "kicked out." Too upset to say anything, other than to issue a blanket denial of wrongdoing, Mr. Sidibe gathered his possessions and prepared to immediately leave the GSR. Mr. Rafaqat made clear he must leave the premises immediately. Mr. Rafaqat was not in the slightest interested in Mr. Sidibe's version of events and did not credit his denials of wrongdoing or conduct any investigation whatsoever. Mr. Rafaqat behaved as if Mr. Sidibe was some unwanted undesirable person who had wandered into the GSR and was being shooed away, like trash.

31.     Mr. Rafaqat's ejection of Mr. Sidibe was an immediate denial of Mr. Sidibe's ability to use and enjoy the GSR, its goods, services, facilities and privileges. As an intended third party's beneficiary of the contract between Ms. Campbell and the GSR. Mr. Sidibe was entitled to be treated as an honored guest, someone deserving of respect and honor and not a piece of trash to be summarily kicked out on the basis of alleged, unproven allegations. At the very least, Mr. Rafaqat could have privately questioned Mr. Sidibe instead of subjecting him to a very public and very embarrassing summary dismissal and ejection. Mr. Rafaqat could have listened to Mr. Sidibe explain the ritual cleansing after urination that might have been mistaken for something inappropriate but was religious and appropriate.

32.     Mr. Sidibe was especially humiliated because these allegations were made in front of his supervisor, Mr. Campbell—making the event especially embarrassing for him.

33.     Mr. Campbell spoke privately to Mr. Sidibe to leave, telling him racial tensions might cause the situation to worsen. Mr. Campbell was worried the situation would escalate and the police might be called. Mr. Campbell was extremely upset with how Mr. Sidibe was treated but did not want the situation made worse with law enforcement involved.

34.     As Mr. Sidibe walked to the gate of the VIP section, he decided to speak to the GSR pool manager, Nick Lester ("Mr. Lester"). Mr. Sidibe wished to understand exactly what had transpired, what he had been accused of doing in the pool, and why he was being ordered to leave. Mr. Sidibe could not believe the unfairness of what had transpired. Mr. Sidibe calmly asked Mr. Lester, "What happened?" Mr. Sidibe did not raise his voice, issue foul language, or behave inappropriately. Mr. Lester indicated he did not know what had happened but promised he would "look into it" and would call Mr. Sidibe to inform him of precisely what he had been accused of doing. Mr. Sidibe provided his telephone number, but contrary to Mr. Lester's promise to "look into the matter," Mr. Lester did not call

Mr. Sidibe back. Mr. Sidibe never heard from Mr. Lester.

35. On or about June 21, 2019, one week after Mr. Sidibe's expulsion from the GSR, Mr. Sidibe returned to the GSR to obtain a copy of the documentation relating to the incident. He was nagged by what had happened as it was very upsetting to him. Mr. Sidibe walked up to the VIP section and asked to speak to Mr. Rafaqat. Mr. Sidibe asked Mr. Rafaqat if he could review the report generated by the June 14th incident. Mr. Rafaqat refused to provide any documentation, explaining that Mr. Sidibe was entitled to nothing. Mr. Rafaqat stated all documents were "internal," for the eyes of the GSR only.

36. Mr. Rafaqat informed Mr. Sidibe that the facts contained in the documents were "no different" than what he had told Mr. Sidibe were the facts relayed to Mr. Sidibe on June 14th.

37. Mr. Rafaqat informed Mr. Sidibe that he was "management," and he had personally made the decision to eject him.

38. Mr. Rafaqat informed Mr. Sidibe, "We had two different people, at two different times, at two different locations complaining about your conduct." He added, "The first one, I could not corroborate that on camera, so for two hours I did not even contact you, until the second complaint came, the same behavior totally different people, not related at all. It's not normal, if one person sees something maybe they are confused. But two different people two different times, many minutes apart, at two different locations."

39. Mr. Sidibe asked if Mr. Rafaqat had a video of the conduct complained of. Mr. Rafaqat said, "I wish were in a different country where we had cameras in the restroom, I don't have any cameras in the restrooms." Mr. Rafaqat said there were no videos of anything in the pool or in the restroom.

40. Mr. Rafaqat reiterated, "When two different people come to you to complain about the 'same behavior' of somebody in two different locations and they don't know each other we have to do

something."

41. Mr. Rafaqat said, "You are not allowed to come back on the property. I am telling you that, it is my call. If you have any questions just call me over the phone." Rafaqat explained that Mr. Sidibe was now "in the system" and could not return.

42. Mr. Rafaqat said: "We had two complaints, from two different people, at two different times, at two different locations that said exactly the same thing. We had to take action." Mr. Rafaqat failed to explain how a complaint that Mr. Sidibe was "weird" in the pool and "touching himself" in the bathroom were "exactly the same thing" or to offer proof that such conduct had occurred.

43. It was made clear to Mr. Sidibe by Mr. Rafaqat that Mr. Sidibe's presence at the GSR was unwanted and unwelcome and under no circumstances could he return.

44. Mr. Sidibe understood that if he returned to the GSR, he would be forcibly ejected and could face criminal trespass charges. Mr. Sidibe was even more upset about this.

45. Mr. Sidibe faces a real and immediate threat that he will be wronged again, in that should he attempt to access, return to, or utilize any of the services and benefits offered by GSR, as a guest, as an invitee, or as a third party intended beneficiary, or in any way whatsoever, he would be expelled again, arrested for trespass, or face a potential criminal charges all of which constitutes substantial irreparable injury.

46. Mr. Sidibe alleges GSR's actions toward him were discriminatory on the basis of race and religion.

47. Mr. Sidibe alleges he was the sole person of African ethnicity in the pool at the time he was in the pool on June 14th and if someone made a complaint about him, it was based on nothing as he did nothing inappropriate at any time. Since the only black persons at the VIP area were in the Campbells' party, and no one in the Campbells' party complained about him, whoever made complaints

about Mr. Sidibe were the white guests present.

48.     Mr. Sidibe alleges that the complaints of white persons, without proof, over his objection, were used to summarily expel him, and to embarrass and humiliate him and to treat him differently and other guests in the VIP section.

49.     Mr. Sidibe alleges that the GSR, and/or its agents, employees, and servants performed, participated in, aided and/or abetted the intentional racial and religious discrimination herein described.

50.     Mr. Sidibe alleges that the GSR ratified, approved, delegated, and authorized all actions of Rafaqat.

51.     Mr. Sidibe alleges the GSR confirmed its discriminatory intent when it made a calculated decision only week after the ejection to refuse to provide a reasonable explanation to Mr. Sidibe and to insist that his summary ejection was proper. Mr. Sidibe alleges the refusal of pool manager Nick Lester was further evidence of discrimination.

52.     Mr. Sidibe alleges that no white person in the VIP area would be summarily dismissed and ejected based on the unsupported word of another guest.

53.     Mr. Sidibe alleges he observed the obsequious and servile manner in which the white guests were treated, with almost submissive and fawning treatment. In contrast, when it came to unsupported allegations against him he was treated like garbage, trash, someone to be summarily expelled as unwanted.

54.     Mr. Sidibe alleges that any white guest in the VIP section with an expensive cabana arrangement faced with same or similar allegations would be treated respectfully, would be asked about what occurred, would be quietly told that complaints were made, and if inappropriate conduct occurred to please not repeat it. Mr. Sidibe alleges guests in the VIP room pay a premium to rent a cabana and

expect courteous respectful treatment for themselves and their guests.

55. In summarily ejecting Mr. Sidibe on the patently false accusation that he was behaving "weird" in the pool and touching himself inappropriately in the restroom, GSR recommitted to intentionally enabling, and thus furthering, racial and religious discrimination. Mr. Faraqat at all times had the capacity, if he wanted to utilize it, of politely asking Mr. Sidibe for an explanation and explaining to him exactly what was said against him. If Mr. Faraqat had done so, he would had learned of the Muslim practice of Wudu and the religious ritual associated with cleansing after urination. If Mr. Faraqat had treated Mr. Sidibe with the respect and courtesy he deserved, he would have learned the last thing Mr. Sidibe was doing in the restroom was a sexually deviant action and instead a centuries old religious custom.

56. Mr. Sidibe alleges that if given an opportunity he would have explained his ritual cleansing in the bathroom and Mr. Rafaqat could, if he had wanted, easily understood that Mr. Sidibe was not "jerking off" but cleaning himself according to his religious custom.

57. Mr. Sidibe alleges that Mr. Rafaqat was not interested in anything he had to say, he was only interested in getting him out of the GSR as quickly as possible—treating him like garbage in the process, without regard for his status as a third party beneficiary of the contractual relationship between Mrs. Campbell and the GSR.

58. Mr. Sidibe alleges GSR made a calculated decision that it was willing to tolerate racial and religious discriminatory accusations against Mr. Sidibe rather than investigate the matter in a fair manner. Mr. Faraqat's response to complaints by white guests against Mr. Sidibe was to expel Mr. Sidibe as quickly as possible.

59. Mr. Sidibe alleges that Mr. Rafaqat's insistence that behaving "weird" in the pool and touching himself inappropriately in the restroom are not the "same thing" and are inconsistent and

nonsensical.

60. Mr. Sidibe alleges that GSR's explanation that two people complained of the identical conduct occurring at the identical place and time is pretextual and unworthy of credence because it is internally inconsistent and not believable. Mr. Sidibe cannot be both behaving "weird" in the pool and "touching himself inappropriately in the restroom" because they are inherently different claims .

61. Plaintiff alleges that GSR's race-neutral reason for the challenged ejection, that two people made identical complaints about him, is a sham designed to conceal its discriminatory motive, to summarily rid itself of a black Muslim guest it did not want on the premises. Had Mr. Rafaqat treated Mr. Sidibe appropriately, as the third-party beneficiary of the contract between Mrs. Campbell and the GSR, he would have been polite, cordial, respectful and appropriate with Mr. Sidibe.

62. Plaintiff alleges that his race and color and his Muslim religion were the motivating factors in his ejection from the GSR.

63. Plaintiff alleges if he had been white and a non-Muslim he would have been treated differently, not summarily ejected from the GSR but accorded an opportunity to understand what accusations were being made against him, explain himself, explain his religious practices, and afforded the respect and courtesy he was due as the third-party beneficiary of the contract between Mrs. Campbell and the GSR.

64. Plaintiff alleges that no reasonable person would confuse the act of pouring a small cup of water over one's private parts in the confidential confines of a private urinal with "jerking off" unless there was a racial and/or religious discriminatory intent to rid the establishment of an unwanted black guest.

65. Plaintiff alleges that GSR's proffered reason for ejecting Mr. Sidibe, that it received two complaints from guests regarding him is a pretext for discriminatory motive. Without proof, GSR

13

summarily ejected Mr. Sidibe, without affording him the opportunity to explain his religious practices or to even understand what could possibly be "weird" about his conduct in the pool.

66. In excluding, prohibiting, and expelling Mr. Sidibe from the GSR premises, Mr. Rafaqat acted within the scope of his employment as GSR director of security.

67. Mr. Rafaqat, as a supervisor, and as an authorized representative of the GSR, at all times had a nondelegable duty to prevent racial and religious discrimination.

68. GSR has in all respects ratified, approved, endorsed, authorized, and consented to the conduct of Mr. Rafaqat, as management, in excluding, banning, prohibiting, and expelling Mr. Sidibe to utilize any of the GSR facilities.

69. GSR owed a duty of care to Mr. Sidibe as the third-party beneficiary of the contract between Mrs. Campbell and the GSR.

70. GSR breached that duty when it summarily kicked Mr. Sidibe out of the GSR on the alleged nonsensical claim that he had acted "weird" in the pool and had "touched" himself improperly in the restroom. The claim was made by white non-Muslim guests at the VIP section without regard for Mr. Sidibe's rights as a black man of African ethnicity and a Muslim.

71. GSR's breach was the legal cause of Mr. Sidibe's injury.

72. Mr. Sidibe suffered damages in the form of emotional distress, disgrace, anxiety, humiliation, embarrassment, and related physical distress.

73. In Nevada, pursuant to NRS 651.070 all persons are entitled to equal enjoyment of places of public accommodation in the manner of goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation, without discrimination or segregation on the ground of race, color, religion, national origin, disability, sexual orientation, sex, gender identity or expression.

74.     In Nevada it is an unlawful discriminatory practice for any persons being the owner, lessee, proprietor, manager, superintendent, agent or employee of any public accommodation, resort or other entity to refuse, withhold from, or deny to any person because of his race, color, sex, religious creed, ancestry, national origin, the full and equal enjoyment of any place of public accommodation.

75.     Mr. Sidibe has filed a complaint with the Nevada Equal Rights Commission alleging discrimination in public accommodations.

## FIRST CAUSE OF ACTION

**(Violation of 42 U.S.C. § 2000(a) Title II of the Civil Rights Act of 1964 as to GSR only)**

76.     Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

77.     Title II of the Civil Rights Act of 1964 prohibits discrimination in public accommodations: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a).

78.     GSR is a "public accommodation" as defined by § 2000(a), a rule prohibiting guests on the basis of race and religion which affects commerce. The snacks served on GSR's premises presumably travels in interstate commerce. Such activities and facilities are sufficient to bring the entire club within the broad scope affecting interstate commerce. § 2000(a) (b)(4).

79.     Plaintiff is a member of a protected class, a black African and a Muslim.

80.     Plaintiff attempted to exercise the right to full benefits and enjoyment of a place of public accommodation and was denied that right.

81.     Plaintiff was treated less favorably at the GSR in the VIP area than white patrons who were fawned over and treated with obsequious respect and courtesy.

82.     Plaintiff was intentionally prevented from enjoying the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the GSR based on his

race and religion.

83. Plaintiff was denied the right to enjoy the benefits of the contractual relationship for which he was the intended third-party beneficiary in that he was deprived of services and benefits of the VIP area while similarly situated persons outside the protected class were not. Further when accused of inappropriate conduct the accusation was made in a markedly hostile manner that a reasonable person not a member of a racial or religious minority would find objectively discriminatory.

84. The benefits and enjoyment of GSR remained available to white and non-Muslim guests of GSR. Such services and benefits remained available to similarly situated persons outside the protected class who received full benefits or enjoyment, and were treated better. No one other than Plaintiff was expelled from the VIP area other than Plaintiff.

85. GSR is liable under the theory of respondeat superior for the acts and omissions of its employees acting within the course and scope of his employment.

86. GSR is liable for the torts committed by its employees in the context of a public accommodation discrimination suit

87. As a direct and proximate result of the aforedescribed willful and unlawful conduct by GSR, its agents, employees, and servants, Plaintiff suffered substantial emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of GSR's unlawful conduct, Plaintiff is entitled to injunctive and declaratory relief. Plaintiff wants the ban against him lifted so that he may return to the GSR if he so chooses. Plaintiff has friends who occasionally utilize the GSR and wants to be able to accompany them if he so chooses. The injunctive relief request is also contained in the accompanying motion for injunctive relief filed contemporaneously with this Complaint.

### SECOND CAUSE OF ACTION

**(Violation of 42 U.S.C. § 1981 As Against GSR and Rafaqat)**

88. Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

89. Section 1981 guarantees that: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens…"

90. Section 1981 protects against impairment by private parties and public entities on the basis of race and religion. Plaintiff sought to enjoy all benefits, privileges, terms and conditions of the contract between Mrs. Campbell and the GSR to which he was an intended third-party beneficiary.

91. Plaintiff is a member of a protected class based on his race and religion.

92. Plaintiff attempted to exercise the rights and privileges of a third party intended beneficiary of the contract between Ms. Campbell and the GSR.

93. Plaintiff was denied the rights, benefits, and full enjoyment of the contractual rights to which he was entitled when he was summarily ejected from the GSR.

94. Plaintiff was the victim of intentional racial and religious discrimination.

95. Others not black and Muslim were allowed to enjoy the rights, benefits, and full enjoyment of the contractual rights of the VIP area after Plaintiff was summarily ejected.

96. Race and religion played a part in Defendants' intentionally discriminatory decision to expel Plaintiff.

97. As a direct and proximate result of the aforedescribed willful and unlawful conduct by Defendants, its agents, employees, and servants, Plaintiff suffered substantial emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of GSR's unlawful conduct, Plaintiff to damages in an amount to be determined at trial.

**98.** The acts of Defendants were intentional, wanton, malicious and oppressive and made with reckless indifference to Plaintiff's rights to be free from racial and religious discrimination in a place of public accommodation thus entitling Plaintiff to an award of punitive damages.

**THIRD CAUSE OF ACTION**

**(Negligence As Against GSR and Faraqat)**

99. Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

100. Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

101. Defendants owed a duty of care to Plaintiff

102. Defendants breached their duty of care to Plaintiff

103. Plaintiff suffered injury.

104. Plaintiff suffered damages.

105. Defendants conduct was the legal cause of Plaintiff's damages.

106. As a direct and proximate result of the aforedescribed willful and unlawful conduct by Defendants, its agents, employees, and servants, Plaintiff suffered substantial emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. As a result of Defendants' unlawful conduct, Plaintiff was damaged in an amount to be determined at trial.

107. Defendants acts were intentional, wanton, malicious and oppressive and made with reckless indifference to Plaintiff's rights to be free from racial and religious discrimination in a place of public accommodation thus entitling Plaintiff to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment against the defendants as follows:

1. For a declaratory and injunctive relief, specifically that the GSR order expelling Plaintiff be vacated and his ability to enter the GSR be re-instated;

2. For actual and compensatory damages from Defendant as to the claims that permit award of such damages in an amount to be determined at trial;

3. For exemplary and punitive damages from Defendant as to the claims that permit award of such damages in an amount to be determined at trial;

4. For attorney fees and costs incurred herein;

5. For leave to amend this complaint should same become necessary;

6. For nominal damages;

7. For such other and further relief as this Court may deem appropriate.

DATED this 8th day of November 2019

                                                /s/ Terri Keyser-Cooper
                                                TERRI KEYSER-COOPE
                                                *Attorney for Plaintiff Oumar Sidibe*