SUSAN HEANEY HILDEN, ESQ.
Nevada Bar No. 5358
shilden@meruelogroup.com
2500 East Second Street
Reno, Nevada 89595
Telephone: (775) 789-5362

Attorney for Defendants
MEI-GSR HOLDINGS LLC dba GRAND SIERRA
RESORT AND CASINO and MOHAMMAD
RAFAQAT

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| OUMAR SIDIBE,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>MEI-GSR HOLDINGS LLC dba GRAND SIERRA RESORT AND CASINO and MOHAMMAD RAFAQAT,<br><br>　　　　　Defendants. | Case No.: 3:19-cv-00681-MMD-WGC<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

Defendants MEI-GSR HOLDINGS LLC dba GRAND SIERRA RESORT AND CASINO ("GSR"), and MOHAMMAD RAFAQAT ("Rafaqat"), by and through their counsel of record, hereby move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Complaint. This motion is brought based on the pleadings and papers on file, the following Points and Authorities, and any and all argument which may be permitted on a hearing of this matter.

**POINTS AND AUTHORITIES**

**I.　INTRODUCTION**

Plaintiff's Complaint alleges causes of action for (1) Violation of 42 U.S.C. §2000(a) Title II of the Civil Rights act of 1964 as to GSR only, (2) Violation of 42 U.S.C. §1981 as to GSR and Rafaqat, and (3) negligence at to GSR and Rafaqat. Plaintiff has failed to state a claim upon which

relief can be granted as to any of these causes of action.

**II.    RELEVANT ALLEGED FACTUAL ALLEGATIONS**

Plaintiff Oumar Sidibe ("Plaintiff") alleges as follows:  He is of black African ethnicity, originally from the country of Mali. Complaint ¶7.  He is a devout practicing Suni Muslim who prays five times a day. *Id.*, ¶8.  He practices Wudu, the Islamic religious procedure for wiping or cleansing parts of the body, which he does by using a small cup of water to wash his private parts when it is necessary for him to use a public restroom. *Id.*, ¶9.

On June 14, 2019, he visited the GSR pool, as an invited guest of the Campbells, who are African American. *Id.*, ¶¶13-15.  Mr. Campbell is Plaintiff's supervisor at Tesla. *Id.*, ¶ 15.  Mrs. Campbell had entered into a "contractual arrangement" with GSR to rent a cabana in the VIP area for the price of $350 plus a 22% gratuity. *Id.*, ¶11.  Mrs. Campbell's contractual arrangement with GSR included the right to invite ten guests, to use the VIP pool, and to order food and drinks. *Id.*, ¶12.   Plaintiff, as the invited guests of the Campbells, was a third-party beneficiary of the contract between Mrs. Campbell and GSR. *Id..*, ¶18.

Plaintiff used the pool, and at the time he did so was the only person of African ethnicity in the pool. *Id.*, ¶ 20.  After exiting the pool, he used the restroom by the pool -- changing from his swimsuit into his street clothes in a toilet stall, then using the urinal to urinate. *Id.* ¶21.  According to Plaintiff's Muslim religion and practice, immediately after urinating he followed the tradition of Wudu, washing his private parts by pouring water over his genitals. *Id.*  After leaving the restroom, he returned to his friends in the VIP section, where he noticed Defendant Mohammad Rafaqat ("Rafaqat"), GSR's Director of Security, engaged in a conversation with Mrs. Campbell. *Id.*, ¶¶5, 22.  He also noticed Mr. Campbell talking with Rafaqat. *Id.*  Rafaqat approached Plaintiff, asking if he was "Oumar," and Plaintiff said he was. *Id.*, ¶23.  Rafaqat stated that they had received two complaints about Plaintiff:  the first was that he was acting "weird" in the pool and the second was that he was "touching himself" inappropriately in the restroom. *Id.,* ¶¶ 23-25.  Plaintiff asked Rafaqat was he meant and asked if there was any video, which Rafaqat said there was not. *Id.*, ¶26.  Plaintiff heard Mr. Campbell in a discussion with Rafaqat, stating words to the effect that Sidibe "is a devout practicing Muslim" and "not the type of person to do anything inappropriate." *Id.*, ¶27.

1.

Mr. Campbell asked Rafaqat if he was accusing Plaintiff of "jerking off" in the restroom and Rafaqat said that he was.  Complaint, ¶27.

Rafaqat said Plaintiff had to immediately leave GSR.  *Id.*, ¶28.  Rafaqat was not interested in hearing what Plaintiff had to say, and had obviously made up his mind to kick Plaintiff out of GSR before talking to hm.  *Id.*  Plaintiff was shocked, confused, and embarrassed, saying this was crazy, he had not done anything, and denying that he had behaved "weird" in the pool or had been "touching himself inappropriately in the restroom."  *Id.*, ¶29.  Rafaqat remained firm that Plaintiff had to leave immediately, and was being kicked out.  *Id.*, ¶30.  Plaintiff gathered his possessions and prepared to immediately leave the GSR.  *Id.*  Rafaqat's ejection of Plaintiff was an immediate denial of his ability to use and enjoy the GSR, its goods, services, facilities and privileges.  *Id.*, ¶31.  As an intended third party beneficiary of the contract between Mrs. Campbell and GSR, Plaintiff was entitled to be treated as an honored guest.  *Id.*

As Plaintiff left the VIP section, he spoke to GSR pool manager Nick Lester, asking him what had happened.  *Id.*, ¶34.  Mr. Lester stated he did not know, but would look into it and call Plaintiff to tell him, but did not do so.  *Id.*  A week later, Plaintiff returned to GSR to obtain a copy of documentation relating to the incident.  *Id.*, ¶35.  Plaintiff met with Rafaqat and asked Rafaqat if he could review the report but Rafaqat refused to provide any documentation, stating all documents were internal.  *Id.*.  Rafaqat told Plaintiff that the facts contained in the documents were no different from what he had told Plaintiff on June 14th – that two different people, at two different times, at two different locations complained about Plaintiff's conduct.  *Id.*, ¶¶, 36, 38.  Rafaqat stated that he could not corroborate the first complaint on camera, so for two hours he did not contact Plaintiff, until the second complaint of the same behavior by a totally different, unrelated person.  *Id., ¶38.*  Rafaqat stated: "It's not normal, if one person sees something maybe they are confused.  But two different people two different times, many minutes apart at two different locations."  *Id.*  When Plaintiff asked Rafaqat if there was a video, Rafaqat told him there were no videos of anything in the pool or the restroom.  *Id.*, ¶39.  Rafaqat reiterated: "When two different people come to you to complain about the same behavior of somebody in two different locations and they don't know each other we have to do something." *Id.*, ¶40.  Rafaqat told Plaintiff he was not allowed to come back on property, and

2.

1  if he had any questions to call him.  Complaint, ¶41 .  Plaintiff faces a real and immediate threat that
2  he will be wronged again if he attempts to return to the GSR.  *Id.*, ¶45.

3  　　　　Plaintiff alleges that GSR's actions towards him were discriminatory on the basis of race and
4  religion.  *Id.*, ¶46.  Since the only black persons at the VIP area were in the Campbells' party and no
5  one in the Campbells' party complained about Plaintiff, whoever made complaints about him were
6  white.  *Id.*, ¶47.  Complaints of white persons, without proof, over Plaintiff's objection, were used to
7  expel him, and to embarrass and humiliate him and treat him differently that other guests in the VIP
8  section.  *Id.*, ¶48.  GSR and its agent and employees performed, participated in, aided and/or abetted
9  the intentional racial and religious discrimination.  *Id.*, ¶49.  GSR confirmed its discriminatory intent
10  when it made a calculated decision a week after the ejection to refuse to provide a reasonable
11  explanation to Plaintiff and to insist his summary ejection was proper.  *Id.*, ¶51.  No white person in
12  the VIP area would be summarily dismissed and ejected based on the unsupported word of another
13  guest.  *Id.*, ¶52.  Plaintiff observed the obsequious and servile manner in which white guests were
14  treated.  *Id.*, ¶53.  Any white guest in the VIP section with an expensive cabana arrangement faced
15  with the same or similar allegations would be treated respectfully, asked about what occurred, and if
16  inappropriate conduct occurred, told to please not repeat it.  *Id.*, ¶54.

17  　　　　If Rafaqat had politely asked Plaintiff for an explanation and explained what was said against
18  him, he would have learned of the Muslim practice of Wudu and religious ritual associated with
19  cleansing after urination.  *Id.*, ¶55.  If Plaintiff had been given an opportunity he would have
20  explained his ritual cleansing in the bathroom and Rafaqat could if he had wanted, easily understood
21  that Plaintiff was not "jerking off" but cleansing himself according to his religious custom.  *Id.*, ¶56.
22  GSR made a calculated decision that it was willing to tolerate racial and religious discriminatory
23  actions against Plaintiff rather than investigate the matter in a fair manner and Rafaqat's response to
24  complaints by white guests . . . was to expel" Sidibe "as quickly as possible."  *Id.*, ¶58.  GSR's race-
25  neutral reason for the challenged ejection, that two people made identical complaints about him, is a
26  sham designed to conceal its discriminatory motive, to summarily rid GSR of a black Muslim guest
27  it did not want on the premises.  *Id.*, ¶61.   If Plaintiff had been white and non-Muslim, he would
28  have been allowed to explain himself and afforded respect and courtesy he was due as a third-party

beneficiary of the contract between Mrs. Campbell and GSR. Complaint, ¶63.

No reasonable person would confuse the act of pouring a small cup of water over one's private parts in the confines of a urinal with "jerking off" unless there was a racial and/or religious discriminatory intent to rid the establishment of an unwanted black guest. Complaint, ¶64. GSR summarily ejected Plaintiff without affording him the opportunity to explain his religious practices or understand what could be "weird" about his conduct in the pool. *Id.*, ¶65. In excluding Plaintiff from the GSR premises, Rafaqat acted within the scope of his employment as director of security, and GSR ratified his conduct. *Id.*, ¶¶66, 68. GSR owed a duty of care to Plaintiff as a third-party beneficiary of the contact between Mrs. Campbell and GSR, and breached that duty when it summarily kicked him out of the GSR o the alleged nonsensical claim that he had acted "weird" in the pool and "touched himself inappropriately in the restroom." The claim was made by white non-Muslim guests at the VIP section without regard for Plaintiff's rights as a black man of African ethnicity and a Muslim. *Id.*, ¶70.

## III. ARGUMENT

In *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014), as amended (Jan. 26, 2015), cert denied, 135 S. Ct. 1845 (2015), the Ninth Circuit held that to avoid dismissal, "a complaint must contain sufficient factual content "to state a claim to relief that is plausible on its face." *Citing Bell Atlantic v. Twombly*, 550 U.S. 444 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The court ruled that "a complaint that offers labels and conclusions a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not suffice." *Landers*, 771 F.3d at 641. The court reasoned: "a claim for relief is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court found, however, that when a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of . . . plausibility of entitlement to relief." *Id.* The Court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Spreewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a

4.

1  violation is *plausible*, not just possible. *Ashcrof v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*,
2  550 U.S. at 555). Plaintiff has failed to plead facts sufficient to establish any cause of action.

3  **A. Plaintiff Has Failed To State A Claim Of Discrimination Under Title II.**

4  A plaintiff establishes a prima facie case of Title II public accommodation discrimination by showing that he or she: (1) is a member of a protected class; (2) attempted to exercise the right to full benefits and enjoyment of a place of public accommodations; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons who are not members of the protected class. *Brown v. Luxor Hotel & Casino*, 2014 WL 2858488, at *2 (D. Nev. June 23, 2014) (citing *United States v. Lansdowne Swim Club*, 894 F.2d 83, 88 (3d Cir.1990)). Once a prima facie case is established, the burden of persuasion shifts to the Defendants to proffer a legitimate business reason for the conduct at issue. *Brown*, 2014 WL 2858488, at *2 (citing *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366, 1370 (S.D.Fla.1999). Because of this similarity to the Title VII paradigm, the burden of proof in Title II cases is in accordance with the allocation of burdens and order of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and clarified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Hornick v. Noyes,* 708 F.2d 321, fn 8 (7th Cir. 1983). *See also Lee v. National Can Corp.*, 699 F.2d 932 (7th Cir.1983). Under this standard, plaintiff has the burden of establishing by a preponderance of the evidence a prima facie case of discrimination, the burden of production then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions, then the burden shifts back to the plaintiff to prove that defendant's proffered reasons were pretextual. *Id.* The ultimate burden of proving discrimination always, of course, rests on the plaintiff. *Id.*

In support of his Title II claim, Plaintiff alleges that he is a black African and a Muslim, he attempted to exercise the right to full benefits and enjoyment of a place of public accommodation and was denied that right, and he "was treated less favorably at the GSR in the VIP area than white patrons who were fawned over and treated with obsequious respect and courtesy." Complaint, ¶¶79-81. Plaintiff's allegations are insufficient to state a claim because he has not alleged that he was treated less favorably than similarly-situated persons who are not members of the protected class.

Regarding religious discrimination, Plaintiff does not plead any facts at all regarding the treatment of non-Muslim guests. Given this complete absence of allegation, he cannot establish a prima facie case of religious discrimination.[1]

Regarding race discrimination, the only allegations are that he "was treated less favorably at the GSR in the VIP area than white patrons who were fawned over and treated with obsequious respect and courtesy." Complaint, ¶¶79-81. This is insufficient to establish that he was treated less favorably than similarly-situated white patrons in the VIP area for purposes of his claim. The gravamen of Plaintiff's Complaint is that he suffered public accommodation discrimination when he was asked to leave the GSR and banned from the premises – not that guests in the VIP area were "fawned over and treated with obsequious respect and courtesy," which would lack the necessary element of denial of benefits to state a claim. Plaintiff alleges that he was asked to leave the GSR after Rafaqat informed him that "they had received two complaints about Plaintiff . . the first complaint was that [he] was acting 'weird' in the pool" and the second complaint was that "he had been 'touching himself' inappropriately in the restroom," which Rafaqat confirmed meant that Plaintiff was accused "jerking off" in the restroom. Complaint, ¶¶ 23-25, 27-28. Plaintiff alleges that this "ejection" was an immediate denial of his ability to use and enjoy the GSR premises. *Id.*, ¶31. Under these circumstances, Plaintiff needs to show that white patrons in the VIP area who were the subject of similar complaints of inappropriate conduct were treated more favorably than he was with respect to those complaints. *See, e.g., Slocumb v. Waffle House, Inc.*, 365 F. Supp. 2d 1332, 1339 (N.D. Ga. 2005) (while the comparators need not be identical for a plaintiff to demonstrate that he was treated less favorably than those outside his protected class, at a minimum "there should be a reasonably close resemblance of facts and circumstances").[2] Plaintiff has not made such allegations,

---

[1] He also does not allege facts sufficient to establish that GSR knew he was Muslim when GSR decided to ask him to leave. He alleges that Rafaqat "had obviously made up his mind to kick Mr. Sidibe out of the GSR, even before talking to him." Complaint, ¶28.

[2] *See also Kline v. Kansas City, Mo., Fire Dept.*, 175 F.3d 660, 1999 WL 270013, * 9 (8th Cir. May 5, 1999) ("Similarly situated" means similar "in all relevant respects.") *See also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998) (plaintiff must show he was "similar in all of the relevant aspects" to persons allegedly receiving preferential treatment); *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir.1997) ("in all aspects"); *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir.1997) ("similarly situated in all material respects"); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989) ("in all relevant aspects"); *Dill v. Runyon*, 1997 WL 164275, *4 (E.D.Pa. Apr.3, 1997) (plaintiff must demonstrate preferential treatment of persons "similarly situated in all material

1  and cannot do so.  This Court regularly grants motions to dismiss Title II claims absent sufficient
2  allegations to establish that plaintiff was treated less favorably than similarly situated persons who
3  are not members of the protected class, and should similarly do so here.  *See, e.g., Brown,* 2014 WL
4  2858488 at *2; *Anjoyous v. Albertsons*, 2017 WL3470573 at *3 (D. Nev. August 10, 2017);
5  *Robinson v. Las Vegas Bistro LLC*, 2019 WL 342117, at *3 (D. Nev. January 25, 2019);  *Smith v.*
6  *Caesars Entertainment Corp.*, 2019 WL 5684171 at* 3 (D. Nev. November 1, 2019).[3]

### B. Plaintiff Has Failed To State A Claim Of Discrimination Under Section 1981.

"Section 1981 prohibits race-based discrimination with respect to the benefits, privileges, terms, and conditions of [a] contractual relationship. 42 U.S.C. § 1981(b)." *Childs v. Boyd Gaming*, 2018 WL 4333945 at *4 (D. Nev. September 11, 2019).  To establish a prima facie case of discrimination in non-employment contracts, Plaintiff must show: (1) he is a member of a protected class, (2) he attempted to contract for certain services, (3) he was denied the right to contract for those services, and (4) such services remained available to similarly-situated individuals who were not members of the plaintiff's protected class. *Id*., citing *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1144 (9th Cir. 2006).  Ninth Circuit courts employ the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas*. *Id.*. "[I]f the plaintiff satisfies the initial burden of establishing a prima facie case of racial discrimination, the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action." *Id*.  "If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination." *Id*.

In support of his Section 1981 claim, Plaintiff alleges that he is a member of a protected class based on his race and religion, attempted to exercise the rights and privileges of a third party intended beneficiary of the contract between Ms. Campbell and the GSR, was the victim of intentional race and religious discrimination, was denied the enjoyment of the contractual rights to

---

respects" to plaintiff).

[3] In discussing sufficient pleading of the similarly-situated factor, this Court, in *Brown*, 2014 WL 2858488, at *2, cited *Slocumb v. Waffle House, Inc.*, 365 F. Supp. 1332 (N.D. GA 2005) as an example.  In that case, an African-American family successfully pled that they were treated less favorably than similarly situated persons outside their protected class by pleading that a hostess seated and served several white families who like plaintiffs had come in groups to eat at the restaurant, prior to seating and serving plaintiffs, despite plaintiffs arrival at the restaurant first.  *Id.*

which he was entitled when he was summarily ejected from the GSR, and others who were not black and Muslim were allowed full enjoyment of contractual rights of the VIP area.  Complaint ¶¶91-95.  These allegations are insufficient to state a claim.

First, Plaintiff fails to adequately allege the requisite contractual element.  Plaintiff must allege the actual deprivation of a contract interest, such as the denial of the right to purchase something or the denial of a benefit for which he had contracted.  *See Morris v. Office Max, Inc.*, 89 F.3d 411, 414-415 (7th Cir. 1996) (§1981 plaintiff must point to specific fact of denial of contract right; the crux of a § 1981 claim is "the actual loss of a contract interest, not merely the possible loss of future contract opportunities."); *Lewis v. JC Penney Company*, 948 F. Supp. 367, 371-372 (D. Del. 1996) (rejecting argument that § 1981 provides remedy for breach of unstated contract that all who enter a commercial establishment will be treated equally as "such a theory would come close to nullifying the contract requirement of § 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts").  Federal courts that have analyzed § 1981 claims in the retail services context have required plaintiffs to show that they were actually prevented from making a purchase or receiving service.  *See, e.g., Ackaa v. Tommy Hilfiger Co.*, No. CIV.A. 96–8262, 1998 WL 136522, at *5 (E.D.Pa.  Mach 24, 1998) ("A § 1981 claim must allege that the plaintiff was actually prevented, not merely deterred, from making a purchase or receiving service after attempting to do so."); *Sterling v. Kazmierczak*, 983 F.Supp. 1186, 1192 (N.D.Ill.1997) (granting defendants' motion to dismiss plaintiff's § 1981 claim where plaintiff failed to allege that he ever found the air rifle cartridges for which he was looking, failed to allege that he was prepared to buy such cartridges before he left the store, and failed to allege that he had the cartridges "in hand" when confronted by police officer).  Plaintiff has not alleged that he attempted to contract with GRS and was denied the right to do so.  He has not alleged that he attempted to buy anything and was prevented from doing so.  Based on his allegations, he was simply socializing at the pool with some friends who invited him to share their cabana, and then he was asked to leave.  This does not establish the necessary contractual interest, or requisite interference with that contractual interest.  His claim fails for this reason alone.

Second, it fails for the same reasons his Title II claim does:  he fails to allege that similarly-

8.

situated people outside the protected class were treated more favorably than he was treated. The mere allegation that others who were not Black and Muslim "were allowed to enjoy the rights, benefits, and full enjoyment of the contractual rights of the VIP area" is insufficient for purposes of his claim. To make a prima facie case, he needs to show that non-Black and non-Muslim patrons in the VIP area who were the subject of similar complaints of inappropriate conduct were treated more favorably than he was with respect to those complaints. *See, e.g., Slocum*, 365 F. Supp. 2d at 1339 ("there should be a reasonably close resemblance of facts and circumstances" between plaintiff and comparators); *Singh v. Wal-Mart Stores, Inc*. 1999 WL374184 at *7-9 (E.D. Penn. June 10, 1999) (Section 1981 claim failed given plaintiff's failure "to identify another customer who had attempted to return an out-of-warranty appliance, purchased another identical appliance and then again attempted to make a return the next day at the same store in the presence of an employee who witnessed the events of the prior day and had been alerted to a conversation in which the customer or his companion discussed replicating the purchase and using the new receipt to do a swap"). Plaintiff has failed to make this allegation, and cannot do so.

### C. Plaintiff Has Failed To State A Claim Negligence.

"A prima facie claim for negligence in Nevada, as elsewhere, consists of four elements: '(1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages.' " *Insco v. Aetna Health & Life Ins. Co*., 673 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (quoting *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008)). In support of his negligence claim, Plaintiff merely alleges that Defendants owed a duty of care to Plaintiff, and Defendants breached their duty of care to Plaintiff, causing Plaintiff to suffer injury and damages. Complaint ¶¶101-105. These allegations are insufficient. *See Landers*, 771 F.3d at 641 ("a complaint that offers labels and conclusions a formulaic recitation of the elements of a cause of action, or naked assertions devoid of further factual enhancement will not suffice").

The numerous general allegations of the Complaint similarly do not allege facts sufficient to state a claim of negligence. The Complaint alleges that when Rafaqat asked Plaintiff to leave, he told Plaintiff that GSR had received two separate complaints about him – first that he had been "weird" in the pool and then that he had been "touching himself inappropriately" in the restroom.

9.

Complaint ¶¶ 23-25.  It further alleges that that when he spoke to Rafaqat the next week, Rafaqat told him that two different people, at two different times, at two different locations complained about Plaintiff's conduct.  *Id.*, ¶¶, 36, 38.  Rafaqat stated that he could not corroborate the first complaint on camera, so for two hours he did not contact Plaintiff, until the second complaint of the same behavior by a totally different, unrelated person. *Id.,* ¶*38*.  Rafaqat stated: "It's not normal, if one person sees something maybe they are confused.  But two different people two different times, many minutes apart at two different locations." *Id.*  Rafaqat reiterated:  "When two different people come to you to complain about the same behavior of somebody in two different locations and they don't know each other we have to do something." *Id.*, ¶40.  GSR has a general duty to ensure the safety of its guests, and it acted in accordance with that duty when it asked Plaintiff to leave following two complaints about Plaintiff, including Plaintiff inappropriately touching himself in a restroom used by children.  This is insufficient to give rise to a claim of negligence.

Notably, Plaintiff alleges that after changing from his swimsuit into his street clothes in a (private) toilet stall, he used the restroom's (public) urinal to urinate, then "followed the Islamic tradition of Wudu which included washing his private parts" by pouring tap water from a small cup over his "private parts" at the (public) urinal, in the presence of other people in restroom.  Complaint ¶¶21-22, fn 2.  Plaintiff thus engaged in conduct that may have been misconstrued by the guest who reported it, and Plaintiff was therefore the legal cause of any alleged damages – not Defendants.  Had Plaintiff simply washed his "private parts" in private, he would not have been asked to leave the pool.

Further, based on his allegations, Plaintiff did *not* mention the alleged ritual of washing his private parts during either his initial discussion with Rafaqat, or their discussion a week later.  Defendants therefore had no way of knowing what Plaintiff was allegedly doing in the restroom, and acted reasonably in asking Plaintiff to leave after receiving a second complaint about Plaintiff, to the effect that he was "inappropriately touching himself in the restroom."  Under these circumstances, Plaintiff cannot establish that Defendants breached a duty towards him, or was the legal cause of his damages.

Finally, Plaintiff cannot state a negligence claim against Rafaqat, who was acting in the

10.

course and scope of his employment as GSR's Director of Security in expelling Plaintiff from GSR. Complaint ¶66.  Rafaqat had no duty towards Plaintiff in his individual capacity and could not have breached any such duty to Plaintiff while acting in the course and scope of his employment as Director of Security.  Accordingly, Plaintiff cannot state a claim against Rafaqat.

### IV.     CONCLUSION

Based on the foregoing, GSR respectfully requests that the Court grant Defendants' Motion to Dismiss.

Dated this 18th day of December 2019.

SUSAN HEANEY HILDEN, ESQ.

 /s/Susan Heaney Hilden
Attorney for Defendants

11.

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on the 18th day of December 2019, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** was served on all persons registered for service in the Court's Electronic Filing system, including but not limited to:

    Terri Keyser-Cooper
    Law Office of Terry Keyser-Cooper
    NV Bar#3984
    1130 Wakefield Trail
    Reno, NV 89523
    (775)337-0323
    Keysercooper@lawyer.com
    Attorney for Plaintiff Oumar Sidibe

                                    */s/Susan Heaney Hilden*